COMMON COUNCIL OF THE CITY OF CROWN POINT, LAKE COUNTY, INDIANA; KENNETH L. HANIFORD, CLERK-TREASURE OF CITY OF CROWN POINT, INDIANA *v*. HIGH MEADOWS, INC., AN INDIANA CORPORATION; CARLOW BUILDERS, INC., AN INDIANA CORPORATION; TURNKEY BUILDERS, INC., AN INDIANA CORPORATION, THOMAS E. SCHMAL; KENNETH C. CATLOW, BRUCE T. FLEMING; HAROLD A. HENDERLONG; AND HAROLD L. WHEELER.

[No. 3-1074A173. Filed May 23, 1977.]

*William B. Davis, Hodges, Davis, Gruenberg, Compton and Sayers,* of Gary, for appellants.

*Porter R. Draper,* of Tulsa, Oklahoma, *Alvan E. O'Connor, Alvarez and O'Connor,* of Gary, for appellees.

GARRARD, J.—The City of Crown Point by its Ordinance No. 828 sought to increase the fees charged for a permit to connect to the city's sanitary sewer system. Under the ordinance the fee for a single family residence would be $500; and for an apartment building, $500 plus $200 for each unit after one.

Appellees (landowners) challenged the ordinance. The trial court sustained the challenge finding that the fees "are substantially in excess of and bear no relation to the actual

cost incurred . . . in issuing permits and inspecting completed sewer connections on existing sewer mains." Admittedly this finding is correct. The city seeks to sustain the ordinance on a different basis. The primary question on appeal is whether the Indiana statutes granting the general powers of cities or those dealing specifically with sewage treatment facilities permit such charges for connection permits. The underlying questions are whether and the extent to which a city is authorized by statute to discriminate between existing users and new users in securing funds to maintain or expand a sewage treatment system.[1]

We conclude that municipal sewage connection charges are not limited to recoupment of the reasonable costs of inspection and the actual work of connection, but that the charges levied under the ordinance in question exceed the statutory authorization and are therefore contrary to law. We, therefore, affirm the judgment declaring Ordinance No. 828 void.

## I. Nature of Connection Charges

As the city argues, it is first necessary to determine whether a charge imposed on the occasion of connection is necessarily limited to the costs of connecting onto the system. *Town of Sellersburg* v. *Stanforth* (1935), 209 Ind. 229, 198 N.E. 437 is typical of a line of authority holding that where a fee is authorized solely to carry out a regulatory purpose, the amount that may be charged is limited to the necessary or probable expense of issuing the license, inspecting and regulating the activity. We have no quarrel with those decisions. Nor do we quarrel with landowners' response that if the charge represents something in addition to the cost of issuing the permit and recouping the cost of the hookup, the overplus constitutes a tax or charge that requires authorization. However, contrary to

1. The preamble of the ordinance includes both maintenance and expansion of the facilities as within its purpose.

landowners' assertion this does not mean, a fortiori, they are illegal.

Such a charge might be termed a use tax, *Brandel* v. *Civil City of Lawrenceburg* (1967), 249 Ind. 47, 230 N.E.2d 778 or, more broadly, an excise tax. *Lutz* v. *Arnold* (1935), 208 Ind. 480, 193 N.E. 840, 196 N.E. 702. As such, it is not within the proscription of Article 10, § 1 of the Indiana Constitution, which requires a uniform and equal rate of taxation.

The only finding entered by the court pertinent to a determination of the legality of the charges was that they "are substantially in excess of and bear no relation to the actual cost . . . in issuing permits and inspecting completed sewer connections. . . ." Since we find, as discussed *infra,* that the city's power is more broad, we examine the evidence from the point of view most advantageous to the city. If on that basis the ordinance is clearly invalid, then we must affirm the trial court even though it erred in the reason it assigned.

In essence the evidence discloses that the city decided to use its connection charge as a means for providing some revenue toward expanding the capital assets of the sewage treatment facility. The evidence indicated that such expenditures would become necessary to meet environmental standards imposed upon the operation of such systems and to expand system capacity as the demands of new customers exceeded the capacity of the existing facility. Thus, one purpose was to place a greater portion of the cost of expanding plant capacity upon the owners occasioning the need for the expansion. However, the improved and/or expansion facilities had neither been built nor designed when the ordinance was enacted, nor had professional cost estimates been prepared. To meet this problem the city determined an average user equity in the existing system by dividing the value of the system carried on its books by the number of

existing users. That value then served as the basis for the charge to be made to new customers.

## II. *Statutory Authority*

The general powers of cities are set forth in IC 1971, 18-1-1.5-1 *et seq.* (Burns Code Ed.). Another statute, IC 1971, 19-2-5-1 *et seq.* (Burns Code Ed.), enumerates municipal powers respecting treatment plants[2] which are declared to be in addition to, and not in limitation of, the city's general powers.[3] Both acts are to be liberally construed.[4] Both must be examined to decide the question before us.

The primary empowerment of the sewage treatment plant statute permits cities to finance construction through the sale of revenue bonds. However, IC 1971, 19-2-5-11 expressly authorizes the city to pay all or a portion of the cost of the works from any cumulative fund established by the city.

Two sections deal with charges the city may levy. IC 1971, 19-2-5-19 authorizes a flat charge for each sewer connection. However, the city concedes that it is inapplicable because it is limited to collecting "for the services to be rendered after the contract for construction of the sewage works has been let and actual work commenced in an amount sufficient to meet the interest on the revenue bonds and other expenses payable prior to the completion of the works."

The other provision, IC 1971, 19-2-5-20, provides:

"The common council of the city or the board of trustees of the town shall, by ordinance, establish just and equitable rates or charges for the use of and the service rendered by the works, payable by the owner of each and every lot, parcel of real estate or building that is connected with and uses the works by or through any part of the sewerage system of the city or town, or that in any way uses or is

---

2. The statute defines "plant" to include all the capital assets with which we are concerned. There is no issue concerning whether any improvements are not within the statute.

3. IC 1971, 19-2-5-26.

4. IC 1971, 18-1-1.5-23, IC 1971, 19-2-5-28.

served by the works and may change and readjust the rates or charges from time to time.

Just and equitable rates and charges shall be such rates and charges as produce sufficient revenue to pay all the legal and other necessary expense incident to the operation of the works to incude maintenance costs, operating charges, upkeep, repairs, interest charges on bonds or other obligations, to provide the sinking fund for the liquidation of bonds or other evidences of indebtedness and reserves against default in the payment of interest and principal of bonds, to provide adequate funds to be used as working capital, as well as funds for making improvements, additions, extensions, and replacements, it being the intent and purpose hereof that such rates and charges shall produce an income sufficient to maintain the sewage works in sound physical and financial condition to render adequate and efficient service. Any rates and charges too low to meet the foregoing financial requirements shall be unlawful. Rates and charges established after notice and hearing pursuant to this act [19-2-5-1—19-2-5-30] shall be deemed prima facie just and equitable.

Revenues collected pursuant to this section shall be deemed revenues of the works. Rates or charges shall not be established until after a public hearing at which all of the users of the works and owners of property served or to be served thereby and others interested, shall have opportunity to be heard concerning the proposed rates or charges.

After introduction of the ordinance fixing rates or charges, but before it is finally enacted, notice of the hearing setting forth the proposed schedule of the rates or charges shall be given by publication in accordance with the provisions of chapter 96 [5-3-1-1—5-3-1-9], Acts of 1927, as amended, at least ten [10] days before the date fixed in the notice for the hearing. The hearing may be adjourned from time to time.

The ordinance establishing the rates or charges, either as originally introduced or as modified and amended, shall be passed and put into effect, after the hearing. A copy of the schedule of the rates and charges so established shall be kept on file in the office of the board having charge of the operation of the works and also in the office of the clerk or clerk-treasurer of the city or town; the copy shall be open to public inspection.

The rates or charges so established for any class of users or property served shall be extended to cover any additional

premises thereafter served which fall within the same class, without the necessity of any hearing or notice. Any change or readjustment of the rates or charges may be made in the same manner as the rates or charges were originally established."

The city urges that this section authorizes establishing a rate or a change which includes an amount to be used for future improvements, additions and extensions. We agree that it does. However, it does not permit such charges to be levied upon the selective basis implicit in establishing the taxable event to be the hookup to the system *when* there is an established group of users of the same system who will, a fortiori, not be subject to the charge. The reason for this is the section's mandate that the charges authorized therein must be "payable by the owner of *each and every* lot, parcel of real estate or building that is connected with and uses the works by or through any part of the sewerage system. . . ."

Even so, we must examine the powers conferred upon the city by the general act to determine whether the ordinance may be authorized under their authority.

Two sections are potentially relevant. IC 1971, 18-1-1.5-4 provides:

"A city shall have power to:

(a)   Charge a reasonable fee for licenses.

(b)   Fix or levy a charge or assessment against property benefiting from the furnishing of municipal facilities or services which is equivalent to the expense of furnishing such facilities or services."

In addition, IC 1971, 18-1-1.5-20 provides in part:

"A city shall not exercise any of the following powers, *unless such power is expressly granted by law* and such power shall be exercised only to the extent and in the manner provided by law:

(a)   The imposition of any tax: Provided, that *this limitation shall not be construed to prohibit* any city from

*imposing fees reasonably related to the costs of administration of licensing or regulating functions or from assessing charges reasonably related to the costs of services performed or special benefits provided by any facility, function or activity* of the City;" (emphasis added)

We have already determined that the charge may not be sustained by the power to regulate and license. Furthermore, the term "special benefits" contained in IC 1971, 18-1-1.5-20 has an established meaning in Indiana law in the context of tax assessments. Its application has been limited to avoidance of general debt ceilings and de jure taxation by assessing against benefited property the actual cost (usually on the basis of Barrett-type construction bonds) of a public work *in esse. See, .e.g., Martin* v. *Ben Davis Conservancy Dist.* (1958), 238 Ind. 502, 153 N.E.2d 125 ; *Adams* v. *City of Shelbyville* (1900), 154 Ind. 467, 57 N.E. 114; *Indiano* v. *City of Indianapolis* (1971), 148 Ind. App. 637, 269 N.E.2d 552. The city has not argued that the term should now receive a broader connotation, and we are not inclined to expand its application.

Thus, the question becomes whether the charge is authorized under IC 1971, 18-1-1.5-20 as reasonably related to the cost of services performed by a facility, function or activity of the city and/or pursuant to the power granted by IC 1971, 18-1-1.5-4 to levy against property benefiting from the furnishing of services "which is equivalent to the expense of furnishing such facilities or services."

The city urges the statute should be liberally construed and section 18-1-1.5-23 so provides. Under liberal construction it is arguable that both section 4(b) and 20(a) should be construed as concerning *only* a grant of power and that they were not intended as a specification of the *manner* in which the power might be exercised. Under such a construction one might avoid the implications urged by the landowners from the legislative use of the past tense, "services performed," in § 20(a).

In our view that is not the critical portion of the section. While the statute as a whole is to be given liberal construction to permit the effective operation and conduct of government,[5] § 20 dealing with the power to tax prohibits its exercise unless expressly granted by law. In that event it may be exercised "only to the extent and in the manner provided by law."

Section 20 (a) does permit the city to levy a charge for services performed by any facility, function or activity of the city. That language is broad enough to cover expansions of the sewage treatment system. However, the section mandates that in establishing such a charge, it must be "reasonably *related* to the *costs*" of the services performed. Similarly, section 4 (b) limits charges against property to an amount "which is *equivalent to the expense* of furnishing."

In *Brandel* v. *City of Lawrenceburg, supra,* our Supreme Court upheld the city's power to use a connection charge as the vehicle for levying a portion of the cost of an expanded sewage treatment system against the residents who used the system.[6] *Brandel* must be distinguished from the present case, however, on the basis that in *Brandel* the actual costs of the construction were known.

Here, admittedly, they are not. The city's formulation clearly represents an effort to arrive at a "fair" figure to constitute the charge to be levied. Just as clearly, neither the figure nor the approach provides an amount, individually or collectively, which bears any demonstrable relationship to the actual costs of the contemplated new services and facilities. To hold that such a nexus is unnecessary would permit a city to levy discriminatory excise taxes, not to

---

5. IC 1971, 18-1-1.5-23.
6. IC 1971, 18-1-1.5-2 *et seq.* was enacted after *Brandel.* The court in *Brandel* did not examine the various statutory provisions involved, but we believe the decision remains viable authority for the factual situation it considered.

pay for the services it was providing, but merely as an indirect method of raising general revenues. Such a result is contrary to the general intent expressed by the legislature. We therefore hold that the city was not empowered to enact Ordinance No. 828 because the charges did not bear a reasonable relationship to the services provided or to be provided by the city.

Since this holding is determinative of the outcome, we need not discuss the evidentiary errors asserted in the conduct of the trial.

Affirmed.

Hoffman, J., concurs; Staton, P.J., concurs in result and files separate opinion.

### CONCURRING IN RESULT

STATON, P.J.—I concur in result for the reason that the connection or "hook on" fee is not part of the plant upon which a rate is based for the services rendered or to be rendered. It is a one time charge which bears no relationship to plant. The connection charge is related to actual cost or expense to effect the connection.

NOTE.—Reported at 362 N.E.2d 1166.